**LAW OFFICES OF G. AARON JAMES**
6 Hunt Street
#336
Rumson New Jersey 07760
Telephone: (732) 291-5143
Facsimile:  (732) 291-5146
*Attorneys for Plaintiffs*
*Mitchell Nelson, Sarah E. Hearn-Nelson, Paulina Giraldo-James*

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT COURT OF NEW JERSEY

| | |
|---|---|
| MITCHELL NELSON, SARAH E. HEARN-NELSON, PAULINA GIRALDO-JAMES; <br><br>           Plaintiffs, <br>    v. <br><br> DON CLAUSSEN; DEREK DEBREE; MARISHA  BARLATIER SIROIS; JULIE SWARTWOOD; LESLIE KRAUSE; ROBERT KELLNER;  MONROE JASON MOYER; MATT MACCIA;  WILLIAM S. RUSTICO;  WILLIAM SCHREIBER; KRISTINE L. CLAUSSEN; ADAM SIROIS;  RAVI SARMA; CRAIG RENAUER;  SUSAN GLASS; MONMOUTH HILLS, INC.;  ARIADNE GOERKE; MARGUERITE ANN GOERKE DOWNEY; CAROL ANN GOERKE TAYLOR; NANCY GOERKE BELL; LELAND CLAYTON CURRIER; WILLIAM FRANK CURRIER; LOUISE KRINSKY; ACCESS PROPERTY MANAGEMENT, INC.; FOX & ROACH LP D/B/A BERKSHIRE HATHAWAY HOMESERVICES FOX & ROACH, REALTORS;  OCEANFIRST FINANCIAL CORPORATION;  TRIDENT ABSTRACT TITLE AGENCY;  MORGAN ENGINEERING  LLC; JOHN/JANE DOES 1-15, fictitious individuals to be named after discovery; and ABC CORPS. 1-5, fictitious business entities to be named after discovery; <br><br>           Defendants. | Docket No.: 2:23-cv-01896 <br><br><br><br> **COMPLAINT** <br> <u>**AND JURY DEMAND**</u> |

Plaintiffs Mitchell Nelson, Sarah E. Hearn-Nelson, and Paulina Giraldo-James ("***Plaintiffs***"), by way of this Complaint against Defendants Don Claussen, Derek Debree, Marisha Barlatier Sirois, Julie Swartwood, Leslie Krause, Robert Kellner, Monroe Jason Moyer, Matt Maccia, William S. Rustico, William Schreiber, Kristine L. Claussen, Adam Sirois, Ravi Sarma, Craig Renauer, Susan Glass, Monmouth Hills, Inc., Ariadne Goerke, Marguerite Ann Goerke Downey, Carol Ann Goerke Taylor, Nancy Goerke Bell, Leland Clayton Currier, William Frank Currier, Access Property Management, Inc., Louise Krinsky, Fox & Roach LP d/b/a Berkshire Hathaway HomeServices Fox & Roach, Realtors, OceanFirst Financial Corporation, Trident Abstract Title Agency, Morgan Engineering LLC, John/Jane Does 1-15, and ABC Corporations 1-5 (collectively, "***Defendants***"), hereby state:

## NATURE OF THE ACTION

1.      This case involves a series of racketeering and other fraudulent schemes, breach of fiduciary duties, self-dealing, tortious interference, detrimental reliance, retaliation, conversion, harassment (racial and otherwise), negligence, forgery, extortion, witness tampering, false claims, and seeks damages and equitable relief from Defendants.

2.      Plaintiffs are recent homebuyers in the Monmouth Hills Historical District ("***Water Witch***") of the Township of Middletown, New Jersey ("***Middletown***"). They are all each either Jewish (Plaintiff Mitchell Nelson), a non-US citizen (Plaintiff Sarah E. Hearn-Nelson), and Latina (Plaintiff Paulina Giraldo-James), whose partner and father of her only child is African American.

3.      The two couples purchased adjoining property in Water Witch (i) the Nelsons in September 2017 and (ii) Giraldo-James in December 2020. Prior to the 1981 subdivision, the two lots formed the substantial estate owned by the Goerke family, owners of the department store chain of the same name (the "***Goerke Estate***"). Other notable owners of the same estate include the Schwab family (securities trading), the Pemberton family (railroad industrialist), and the Goodrich family (tire manufacturer).

4.      The original six story residence of the Goerke Estate is prominently situated at the entrance of Water Witch, has a historic in-ground pool and tennis court, is over 50% larger than

the second largest home in Water Witch, and is the most expensive property ever purchased in Water Witch. It is the crown jewel of Water Witch, and its new owners have black and brown skin.

5.      The 28 named Defendants are Defendant Monmouth Hills, Inc. ("*MHI*") and (i) all four of its current officers (Defendants Don Clausen, Derek DeBree, Marisha Barlatier Sirois, Julie Swartwood, collectively "*Current Officer Defendants*"); (ii) six of its recently former officers and directors (Defendants Leslie Krause, Robert Kellner, Monroe Jason Moyer, Matt Maccia, William S. Rustico, and William Schreiber, collectively "*Former Director Defendants*"); (iii) one of its former corporate committee chairpersons (Defendant Kristine L. Claussen) (iv) three of its non-officer/non-director shareholders (Defendants Adam Sirois, Ravi Sarma, and Craig Renauer, collectively "*Shareholder Defendants*"); (v) one non-homeowner and non-shareholder who is the live-in companion of another shareholder (Defendant Susan Glass); (vi) six former residents of the Georke Estate and/or heirs to the former owners of the Georke Estate who recently executed deeds and other agreements claiming to transfer rights to property previously deeded to Plaintiffs (Defendants Ariadne Goerke, Marguerite Ann Goerke Downey, Carol Ann Goerke Taylor, Nancy Goerke Bell, Leland Clayton Currier, William Frank Currier, collectively "*Goerke Defendants*"); and (vii) six vendors (Defendants Access Property Management, Inc., Louise Krinsky, Fox & Roach LP d/b/a Berkshire Hathaway HomeServices Fox & Roach, Realtors, OceanFirst Financial Corporation, Trident Abstract Title Agency, Morgan Engineering and Surveying, collectively "*Vendor Defendants*").

6.      The Defendants are engaged in an enterprise that commits fraud via email, video-conferencing, and other means for the purpose of extracting property, including real property and "fees," with the purpose to:

(a) conceal the willful conduct and wanton disregard for public safety caused by the catastrophic deterioration and failure of the 127-year-old dirt roadway

system of Water Witch (the "***Dirt Roads of Water Witch***") that cause major flash flooding downhill in the neighboring Borough of Highlands ("***Highlands***") resulting in major vehicular accidents on and the regular closure of New Jersey State Highway Route #36;

(b) conceal the results of (i) the investigations by the New Jersey Department of Environmental Protection ("NJDEP") that was initiated by a 2019 complaint filed by Highlands against MHI, and (ii) a study by MHI's own engineers that the Dirt Roads of Water Witch are "dangerous" and responsible for discharging annually 170 tons of road materials into the Sandy Hook Bay, which are waters of the United States;

(c) engage in self-dealing by usurping corporate opportunities owned by MHI and diverting them, with the assistance of attorneys that claim they represent the corporate entity that is MHI, to shell companies owned by directors, officers and shareholders in their individual capacity;

(d) deceive homeowners of Water Witch into dedicating the real property they hold in fee simple to a non-existent "Master Deed" by acknowledging, by way of a shareholder vote, the existence of a "Master Deed;"

(e) retaliate against Plaintiffs, who agreed to cooperate with and give evidence to the NJDEP that instantly resulted in the issuance of a Notice of Violation against MHI in May 2022, by arranging to divert the pollution that MHI had been discharging toward Highlands and the waters of the United States for over twenty years, to land owned and uphill from the homes of Plaintiffs;

(f) convince Highlands, which has applied for $16 million of federal funds made available in the form of a grant by the Federal Emergency Management Agency ("FEMA"), to use such funds to assist MHI, which is not in a flood hazard zone,

with committing environmental racism against Plaintiffs, who are full rate taxpayers of Middletown and not Highlands;

(g)  perpetuate its historic practices of discrimination and harassment of protected classes, which was (i) codified within MHI's bylaws prior to 1972, (ii) deemed illegal by the Civil Rights Act of 1968, (iii) removed from MHI's bylaws due to the heroic efforts of the (now late) Honorable Merritt Lane, Jr., who was a MHI resident at the time, and (iv) reinitiated in the late 1980s after the untimely passing of Judge Lane by way of arranging with Middletown for MHI to "own" the Dirt Roads of Water Witch, which was done in order to "control" and harass selective homeowners;

(h)  tortiously interfere with homeowners' rights as full rate Middletown taxpayers by (i) refusing to dissolve MHI and use proceeds to make the Dirt Road of Water Witch safe for all so that Middletown can accept them as public roads, and (ii) preventing Middletown from conducting any non-routine maintenance on the Dirt Road of Water Witch pursuant to a 1989 township ordinance; and

(i)  interfere with and manipulate the legal process of government, including, but not limited to recording with and submitted to government officials, forged documents;

(j)  limit the utilization of MHI's sole revenue-generating asset, a wedding hall venue, to benefit the desires of the handful of owners who chose to buy a home next to a wedding hall and now control the Board of Directors, all to the financial detriment of the corporate entity, MHI;

(k)  prevent the sale, for the benefit of the corporation, of two of the last three buildable lots that sit next to the homes of three MHI officers who want to maintain a sense of wooded seclusion; and

(l)  continue the practice of tax evasion both on an individual and corporate basis.

7.      The nature of the scheme is also extortionary in that the Defendants work to convince, intimidate, cajole, and deceive shareholders into (i) paying "fees" or "assessments" toward the liabilities of the corporate entity that is MHI, and (ii) conveying their fee simple interest in real property to a master deed that Defendants, via MHI, can control.

8.      Defendants engage in systematic discrimination and harassment based on protected classes. Many display their middle finger, sometimes with threats that, "You'll see what is going to happen to you" and slow their cars to peer at and photograph Plaintiffs on their properties with their pre-school children, even while Defendants are being videotaped by home security systems. The home of Giraldo-James was pelted with watermelon rinds around the time of a pool party hosted by her neighbors across the street.

9.      The most extreme of the harassers is Defendant Susan Glass, with many of her assaults captured on videotape. Her most vocal assault occurred on 9/11/22. She extended her middle finger at Giraldo-James as she drove past shouting "Why don't you move—no one wants you here!"

10.      Upon information and belief, Defendant Kristine L. Claussen, like her husband, lead the charge in the parade of residents that extend their middle finger as they drive past Plaintiffs' home resulting in their children inquiring as to why cars are slowing and why people are extending their middle fingers.

11.      Defendant Kristine L. Claussen, like her husband, pretends to hold herself as a leader. Her response to the attack on 9/11/22 was to round up fellow residents and make out a false police report claiming that Giraldo-James and her partner exited the vehicle. Her biggest lie was that she witnessed anything. If she had, she would have known that the entire journey was videotaped by Giraldo-James to document all the license plates to assist the police department of Middletown to identify all those videotaped given her "the finger." If Defendant Kristine L.

Claussen did actually witness events, she would know that no one exited the vehicle and that Defendant Susan Glass instigated the interaction without provocation.

12.     Upon information and belief, homeowners who have expressed to the Current Officer Defendants their outrage as to what appears to them to be racial hostilities toward Plaintiffs, the Current Officer Defendants have confirmed that they are aware, they have warned concerned homeowners to keep quiet about it, and they have verbally attacked homeowners when they share concerns with other shareholders. Some concerned homeowners report that they have had their tires on their automobiles slashed.

13.     Plaintiffs have contacted the police department of Middletown who have filed numerous reports and recommended that Plaintiffs file criminal charges. Plaintiffs informed the current social committee chairperson of the conduct and the video documentation. However, while MHI's Board of Directors "are aware" of this ongoing harassment, Plaintiffs have received no response from any MHI Director. In fact, the behavior is encouraged, excused, and/or applauded.

14.     The Current Officer Defendants now threaten to extract legal fees from any shareholder pursuing litigation against Defendant MHI in anticipation of this instant action, while refusing to modify the bylaws to include a dispute resolution provision as required by law.

15.     Prior to the arrival of the Current Officer Defendants beginning in 2017, participation in MHI was voluntary. In fact, three current owners of real property in Water Witch, who purchased from MHI shareholders, are not shareholders nor charged any fees. Attached hereto as **Exhibit A** is a survey of deeds to all lands that are/were affiliated with Defendant MHI.

16.     Of the 43 real property owners within Water Witch, only seven deeds that conveyed their interest in the real property contain restrictions as to MHI and its so-called but non-existing

rules and regulations (the "Alleged MHI Restrictions") and not even one of these seven deeds were executed after the 2016 Cavanagh Judgement (described below).

17.     The only restriction around the use of real property by shareholders is found in Defendant MHI's bylaws and is a typical common scheme obligation requiring the submission of plans as to any "new" buildings. The bylaws specifically state there are no restrictions as to any "additions or improvements to existing residences."

18.     While Defendant Don Claussen leads the charge in falsely misrepresenting to government officials and shareholders that MHI is a homeowner's association with a master deed for which he alone has authority to act; the deed to the real property that he and his wife, Defendant Kristine Claussen, own in Water Witch contains no Alleged MHI Restrictions. The same is true of the deeds of Defendants Adam Sirois, Marisha Sirios, Julie Swartwood, Ravi Sarma, Divya Kapur, MHI Director Michael O'Neil and his wife Kathy O'Neil, and many others.

19.     Given this hypocrisy, financial ruin, selective enforcement, retaliation, lack of temperament, and harassment, Plaintiffs do not want to associate with Defendant MHI.

20.     ***As to Defendant MHI only, Plaintiffs are primarily seeking from the Court compensation for their surrendered shares in MHI and the return of all paid "fees" unrelated to services that (i) were actually provided by Defendant MHI, and (ii) to which Plaintiffs were not otherwise entitled as full-rate taxpayers of Middletown***. Plaintiffs have no use for a clay tennis court that is muddy most days or a dilapidated clubhouse to which Defendant Kristine Claussen has refused to provide Plaintiffs a key to access. Plaintiffs can pay their own fees for sewer services directly to Highlands.

## PARTIES

21.    Plaintiff Mitchell Nelson is a Jewish citizen of New Jersey, residing at 27 Bayview Terrace, Middletown, New Jersey 07732 ("27 Bayview"), which he owns with his wife, Plaintiff Sarah Hearn-Nelson. He spends a significant amount of his time in Florida.

22.    Plaintiff Sarah Hearn-Nelson is a citizen of the United Kingdom of Great Britain and Northern Ireland, residing at 27 Bayview Terrace, which she owns with her husband, Plaintiff Mitchell Nelson. She spends a significant amount to her time in Florida.

23.    Plaintiff Paulina Giraldo-James is a Latina citizen of New York, residing at 20 Exchange Place, #2214, New York, New York 10005, and owner of record of 30 Bayview Terrace, Middletown, New Jersey 07732 ("30 Bayview").

24.    Upon information and belief, Defendant Don Clausen is a citizen of New Jersey, residing at 42 West Twin Road, Middletown, New Jersey 07732, who appears to be the *de facto* president of Defendant MHI although there are no corporate records as to when he became president or even having been elected as such. At times, he claims that he is both the "president" and "treasurer."

25.    Upon information and belief, Defendant Derek DeBree is a citizen of New Jersey, residing at 4 Serpentine Drive, Middletown, New Jersey 07732, who appears to be the *de facto* treasurer of Defendant MHI although there are no corporate records as to when he became treasurer or even having been elected as such.

26.    Upon information and belief, Defendant Marisha Sirios is a citizen of New York, residing at 1 Pike Street, Apartment C2, New York 10002, which she owns with her husband Defendant Adam Sirios, 24 Witches Lane, Middletown, New Jersey 07732, and who appears to be

the *de facto* secretary of Defendant MHI although there are no corporate records as to when she became secretary or even having been elected as such.

27.    Upon information and belief, Defendant Julie Swartwood is a citizen of New Jersey, residing at 2 Serpentine Drive, Middletown, New Jersey 07732, and who appears to be the *de facto* vice president of Defendant MHI although there are no corporate records as to when she became vice president or even having been elected as such.

28.    Upon information and belief, Defendant Leslie Krause is a citizen of New Jersey and an attorney who was deemed ineligible to practice law in the State of New Jersey, residing at 19 Park Way, Middletown, New Jersey 07732, and was the president of MHI up to and during the months of July and August 2019.

29.    Upon information and belief, Defendant Robert Kellner is a citizen of New Jersey and a licensed architect, residing at 36 West Twin Road, Middletown, New Jersey 07732, who previously sat on the Board of Directors of MHI and is currently the chair of MHI's tree committee.

30.    Upon information and belief, Defendant Monroe Jason Moyer ("Defendant Clausen") is a citizen of New Jersey, residing at 5 Nicol Terrace, Rumson, New Jersey 07732 as of July 27, 2021, but previously owned 14 Witches Lane, Middletown, New Jersey 07732 and previously was a shareholder of MHI and sat on the Board of Directors of MHI.

31.    Upon information and belief, Defendant Matt Maccia is a citizen of New Jersey, residing at 25 Waterwitch Drive, Middletown, New Jersey 07732, who previously sat on the Board of Directors of MHI.

32.    Upon information and belief, Defendant William S. Rustico is a citizen of New Jersey, residing at 9 Serpentine Drive, Middletown, New Jersey 07732, who previously sat on the Board of Directors of MHI.

33.    Upon information and belief, Defendant William Schreiber is a citizen of New Jersey, residing at 35 Seaview Terrace, Middletown, New Jersey 07732, who previously sat on the Board of Directors of MHI.

34.    Upon information and belief, Defendant Kristine L. Claussen is a citizen of New Jersey, residing at 42 West Twin Road, Middletown, New Jersey 07732, who previously was the chairperson of MHI's social committee.

35.    Upon information and belief, Defendant Adam Sirios is a citizen of New York, residing at 1 Pike Street, Apartment C2, New York 10002, which he owns with his wife Defendant Marisha Sirios, 24 Witches Lane, Middletown, New Jersey 07732, and is a shareholder of MHI.

36.    Upon information and belief, Defendant Ravi Sarma is a citizen of New Jersey, residing at 17 Park Way, Middletown, New Jersey 07732, and is a shareholder of MHI.

37.    Upon information and belief, Defendant Craig Renauer is a citizen of New Jersey, residing at 32 Seaview Terrace, Middletown, New Jersey 07732, and is a shareholder of MHI.

38.    Defendant Monmouth Hills, Inc. is a New Jersey for-profit corporation expressly "reformulated" under and subject to the law of the New Jersey Business Corporation Act (*N.J.S.A.* 14A:1-1, et seq.) on June 24, 1972, with offices located at c/o Access Property Management, 4 Walter E. Foran Blvd., Suite 311, Flemington, NJ 08822.

39.    Upon information and belief, Defendant Ariadne Goerke Downey is a citizen of Virginia residing at 713 North Lincoln Street in Arlington, Virginia 22201.

40.    Upon information and belief, Defendant Marguerite Ann Goerke Downey is a citizen of Virginia residing at 1400 S Joyce Street, Apt. 118 in Arlington, Virginia 22202-1803.

41.    Upon information and belief, Defendant Carol Ann Goerke Taylor is a citizen of North Carolina residing at 102 Debrock Court in Cary, North Carolina 27519-7360.

42.    Upon information and belief, Defendant Nancy Goerke Bell is a citizen of New York residing at 53 Cherry Street in Geneva, NY 14456-1605.

43.    Upon information and belief, Defendant Leland Clayton Currier is a citizen of Maryland residing at 340 Stonehouse Drive in Severna Park, MD 21146-2025.

44.    Upon information and belief, Third-Party Defendant William Frank Currier is a citizen of South Carolina residing at 8661 Monticello Road in Columbia, SC 29203-9706.

45.    Upon information and belief, Defendant Access Property Management, Inc. ("Access") is a New Jersey for-profit corporation with its principal place of business located at 1090 King Georges Post Rd Ste 301, Edison, New Jersey, 08837 and purports to serve as the property manager of MHI.

46.    Upon information and belief, Defendant Louise Krinsky is a citizen of New Jersey residing at 1 Portland Rd, Unit #7, Highlands, New Jersey 07732, is an officer of Access Property Management, and identified herself as the "secretary" of MHI.

47.    Upon information and belief, Defendant Fox & Roach LP d/b/a Berkshire Hathaway HomeServices Fox & Roach, REALTORS® is a licensed real estate broker in the State of New Jersey with a branch office located at 110 Avenue of Two Rivers, Rumson, New Jersey 07760, for which Defendant Derek DeBree is an employee and agent.

48.    Upon information and belief, Defendant OceanFirst Financial Corporation is a New Jersey for-profit corporation with its principal place of business located at 975 Hooper Avenue

Toms River, New Jersey 08753, whose subsidiaries coordinate to provide a suite of services to homebuyers.

49.     Upon information and belief, Defendant Trident Abstract Title Agency is a corporate subsidiary of Defendant OceanFirst Financial Corporation with its principal place of business located at 1340 A, Campus Pkwy, Wall Township, New Jersey 07753.

50.     Upon information and belief, Defendant Morgan Engineering LLC is a New Jersey limited liability company with its principal place of business located at 130 Central Avenue, Island Heights, NJ 08732.

## **RELATED PARTIES**

51.     Upon information and belief, Arthur Phair is a citizen of New Jersey, residing at 36 East Twin Road, Middletown, New Jersey 07732, which he purchased in 1988, and now owns with his wife, Joan Kugelmann, and sits on the Board of Director of MHI.

52.     Upon information and belief, Michael O'Neil is a citizen of New Jersey, residing at 34 Seaview Terrace, Middletown, New Jersey 07732, and sits on the Board of Director of MHI.

53.     Upon information and belief, Joan Kugelmann, is a citizen of New Jersey and retired attorney licensed in the State of New Jersey, residing at 36 East Twin Road, Middletown, New Jersey 07732, which she now owns with her husband Arthur Phair, and formerly chaired the legal committee of MHI.

54.     Upon information and belief, Richard King, is a citizen of New Jersey and an attorney who was deemed ineligible to practice law in the State of New Jersey, residing at 22 Witches Lane, Middletown, New Jersey 07732, who served as president of MHI for decades since the late 1980s.

55.     Upon information and belief, Lauren Plump is a citizen of New Jersey, who is a principal and the chief executive officer of Morgan Engineering LLC.

56.     Upon information and belief, Cutolo Barros, LLC is a New Jersey limited liability company with its principal place of business located at 46-50 Throckmorton St, Freehold, New Jersey 07728 and purports to at as legal counsel representing the corporate entity that is MHI.

57.     Upon information and belief, Gregg S. Sodini, Esquire, is a citizen of New Jersey and a licensed attorney residing at 7 Hemlock Court, Manalapan, New Jersey 07726, who is an employee and/or agent of Cutolo Barros, LLC.

58.     Upon information and belief, Hubert C. Cutolo, Esquire, is a citizen of New Jersey and a licensed attorney residing at 21 Carriage Hill Drive, Colts Neck, New Jersey 07722, who is an employee and/or principal of Cutolo Barros, LLC.

59.     Upon information and belief, Daniel Barros, Esquire, is a citizen of New Jersey and a licensed attorney residing at 6 North Main Street, Allentown, New Jersey 08501, who is an employee and/or principal of Cutolo Barros, LLC.

60.     Upon information and belief, Kathy O'Neil is a citizen of New Jersey, residing at 34 Seaview Terrace, Middletown, New Jersey 07732, and is the wife of Michael O'Neil.

61.     Upon information and belief, Lynn Maccia is a citizen of New Jersey, residing at 25 Waterwitch Drive, Middletown, New Jersey 07732, who previously sat as chairperson of MHI's wedding committee.

## JURISDICTION AND VENUE

62.     Jurisdiction over the subject matter of this action is proper pursuant to 28 U.S.C. § 1331, as the allegations in this Complaint assert violations of (i) the Racketeer Influenced and

Corrupt Organization ("RICO") Act, 18 U.S.C. §§ 1961-68, based upon, among other criminal activities, wire fraud, and extortion, (ii) the Civil Rights Act of 1866, 42 U.S.C. §§ 1981, 1982, and the Fair Housing Act of 1968, as amended, 42 U.S.C. §§ 3601-19 ("FHA"), and (iii) the Federal Fair Debt Collection Practices Act, 15 U.S.C. §1692, et seq. (hereinafter "FDCPA").

63.     This Court has jurisdiction over state law and common law claims asserted herein under the doctrines of ancillary and pendent jurisdiction and pursuant to the supplemental jurisdiction provision of 28 U.S.C. § 1367(a).

64.     Venue is proper in the United States District Court for the District of New Jersey under 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to the claims occurred in this District and most of the Defendants reside in this District.

## **FACTUAL BACKGROUND**

i.      *Legal Status of Monmouth Hills, Inc.*

65.     Defendant MHI is a New Jersey for-profit corporation expressly "reformulated" under and subject to the law of the New Jersey Business Corporation Act (*N.J.S.A.* 14A:1-1, et seq.) on June 24, 1972.

66.     Also on April 4, 2023, Defendants Derek DeBree and Don Claussen admitted that Defendant MHI is not in a position to pay its liabilities as they come due.

67.     Defendant MHI is a planned real estate development and subject to the law of the Planned Real Estate Full Disclosure Act (*N.J.S.A.* 45:22A-21 et seq.).

68.     In a 2016 Judgment entered by the Honorable Thomas W. Cavanagh, Jr., P.J.Ch., the Superior Court of New Jersey (the "2016 Cavanagh Judgement"), the court established that:

> *"[MHI] concedes they are not a condominium association, and therefore they are not entitled to any sort of consideration under the Condominium Act. Secondly, [MHI] concedes it is not a homeowner's association. So none of the rights and advantages of a homeowner's association belong in this particular matter. Thirdly, there is no recorded master deed for the obvious reason, that these properties are not constructed under a condominium concept. So there is no master deed."*

69.    Prior to the arrival of the Current Director Defendants, there was no dispute as to MHI's status. Like many corporate vehicles, it was formulated to profit in the purchase, subdivision, development, and sell of real estate, before its dissolution.

70.    MHI still owns (i) a few lots that it was not able to sell since the subdivision was created in 1896, (ii) a clubhouse, and (iii) a tennis court.

71.    By 1989, most residents had lost interest in paying for the assets owned by MHI, so a decision was made to sell the dilapidated clubhouse, so that a developer could demolish it and build single family homes. However, prior to being voted on by MHI shareholders, an alternative proposal was made—that the clubhouse had to be self-sufficient and that shareholders would no longer be responsible for its upkeep or repairs, which would be funded by monies it generated as a wedding hall. Many voted for its demolition, but ultimately a majority of shareholders voted to prohibit MHI from "assessing" shareholders for any repairs or expenses related to that structure.

72.    At this time, Richard King was president of MHI.

73.    Lynn Maccia is the wife of Defendant Matt Maccia, who were married at the clubhouse. She had been an advocate for keeping separate the money between the clubhouse and the fees that homeowners are charged, however, under information and belief, with the onset of the COVID-19 shutdown, she reversed course. Counsel for Plaintiffs reached out to her husband to discuss how to segregate the two, but she never responded.

74.    In 2006, the shareholders of MHI soundly rejected a proposal created by Joan Kugelmann to "amend" the bylaws to effectively create covenants, conditions, and restrictions

("CC&Rs") that would have allow MHI representatives to dictate what homeowners could do with their fee simple property, including granting the right to enter the residences of shareholders.

75.     As of the date of this Complaint, MHI remains without authority to (i) assess its shareholders for the cost and expense of the clubhouse, and (ii) does not have CC&Rs. Like any other corporation, MHI's authority is limited to the assets that the corporation owns.

### ii.     _MHI's History of Racial Exclusion and Harassment_

76.     Upon information and belief, there have been countless episodes of the more vocal residents in the community making life difficult for non-whites and Jewish homeowners over the years. This is no surprise as it was not until 1972 that Defendant MHI revised its by-laws to remove the condition that no home could be purchased unless the Board of Trustees deemed that prospective homeowner to be "eligible" to purchase.

77.     Upon information and belief, this illegal requirement was enforced by MHI notwithstanding the enactment of the Fair Housing Act in 1968 that prevented such discrimination. In fact, MHI changed its rule only because of one brave homeowner who threatened to sue, hold out his vote for a requisite recapitalization, and seek the dissolution of the corporation. That holdout was not anyone in the Goerke family, but the (now late) Honorable Merritt Lane, Jr., who on the December 14, 1970 wrote to Donald L. Struve, the then current president of MHI attaching the draft complaint.

78.     The treatment that Plaintiffs have suffered appears to them very similar to what they discovered, in conversations with former residents, had been done in Water Witch over the past twenty-five years to victimize homosexual couples, interracial couples, single women, Jewish families, non-whites, and foreigners.

79.     The Current Officer Defendants and Former Director Defendants feel they can be so blatant because they curry favor with the only other African American homeowner in Monmouth Hills, Defendant Marisha Barlatier Sirois, who has never actually fulfilled any of her duties pursuant to MHI by-laws. In return, she has also been "approved" by the MHI Board to build an oversized ultra-modern home on an undersized lot in historic Water Witch.

80.     Defendant Marisha Barlatier Sirois was happy to use the color of her skin as currency to seek Giraldo-James' support in constructing her glass and steel three-story building in a historical district that Giraldo-James will be forced to stare at from her home. However, Ms. Sirois claims to "not have the same myopic and antiquated notions" of race shared by most African Americans who actually have and do experience racism in their lifetime and in this country.

81.     While African Americans finally achieved the goal of universal condemnation of offensive characterizations of African Americans in the form of Uncle Ben and Aunt Jemima; Ms. Sirois is happy to compromise her brown skin in a manner that many found misogynistic and racist in a mural depicting her in New York City. Plaintiffs believe that because she is so complicit and indifferent to any assault on her race, she serves as a perfect foil to racists in the community who simply point to their relationship with Ms. Sirois to declare their motives are not racist.

82.     Plaintiffs have had to call the police no less than seven times around incidents coming from people Giraldo-James has never met, but who do know Defendants Claussen and DeBree. Of the various incidents, her house has been pelted with watermelon rinds. Defendant Leslie Krause extended his middle finger to Plaintiff and her family, including her five-year-old child declaring "Yes, I am giving you *this* finger". Mr. Krause was sitting on the porch of the home of Michael O'Neil, who was sitting with Mr. Krause and his wife during the entire event approving of the behavior.

83.     While Giraldo-James walked her dog at 6:30am on a Sunday morning only a few days after the 9/11/22 attack, Defendant Susan Glass, shouted obscenities from her yard unprovoked. She again shouted that Giraldo-James should move, that "Nobody Likes You," "You Fucking Cunt," and that "You better not come to the Halloween Party."

84.     Plaintiffs have received no apologies for the level of abuse and harassment received, and there has been no condemnation of racism or harassment by anyone on the Board of Directors. Plaintiff partner's skin color was even a butt of a joke during a virtual MHI Board meeting. They are all aware of this conduct and are all complicit in escalating and weaponizing the same.

85.     Plaintiffs view these people, to whom they have done nothing, as true sociopaths that can only exist amongst other animals that choose to stay hidden in the woods. Plaintiffs have made clear that they want no part of their abusive cult, so the cult retaliates.

86.     On April 4, 2023, Defendant Derek DeBree admitted that he instructed all MHI Directors to no speak to Giraldo-James because she wrote an 11-page single spaced letter to the Board voicing her concerns around the state of the infrastructure and that Defendant Don Claussen had failed to live up to any promises he made regarding disclosures and a key to the clubhouse.

iii.    _Harassment Exercised through the Dirt Roads of Water Witch_

87.     Upon information and belief, up until residents lost interest in paying for the dilapidated infrastructure of Waterwitch in the last 1980s, MHI has always taken the position that in filing the map entitled "Map of Lands of Water Witch Club in the Highlands of Navesink, Monmouth County, New Jersey" filed in the Monmouth County Clerk's Office on January 17, 1896, in Case No. 70, Sheet 1 (the "1896 Map"), the roadway system of Water Witch was the responsibility of Middletown.

88.    Upon information and belief, because Middletown was having financial difficulties during the 1970s, it took the position that MHI's dedication of the roadway system was never accepted by Middletown.

89.    Entities like MHI were common in the area for some time. However, as municipalities grew, generated tax revenues, and provided more services, and with economic downturns, each such entity would liquidate their assets, bring their roads up to par, dedicate the roads to the municipality, and dissolve. This is akin to the current model in which a developer creates a shell company to buy land to subdivide, improve the new roads to dedicate to the municipality, and then dissolve.

90.    Plaintiffs understand that Defendant MHI need simply sell all its real estate, which is worth millions of dollars and kept off the books, improve the roads, dedicate them to Middletown, and dissolve. MHI does not do that because those who "run" MHI would lose control over the other residents.

91.    The Current Officer Defendants and Former Director Defendants attempt to convince homeowners that the reason the roads of Water Witch remain dirt and unimproved is because of a desired historical aesthetic. The truth is it has always come down to the inability of MHI to afford to pave the roads without abandoning their desire to maintain as a separatist commune. Middletown has always made clear what Defendant MHI needs to do in order to obtain financial support around the Dirt Roads of Water Witch.

92.    Upon information and belief, there was a dramatic change in 1989 as a negotiation between MHI and Middletown resulted in an agreement by which MHI would declare that it owned the roads and any liability arising therefrom, in exchange for Middletown committing to providing non-routine maintenance (the "1989 Agreement"). This agreement was authorized by way of Middletown Ordinance #89-2117.

93.    Upon information and belief, while MHI and Middletown co-existed as best they could while debating as to whether work was routine or not; Middletown did (i) provide MHI with the road material needed to crown the roads, (ii) recover any road material that found its way into the stormwater basin below where Water Witch borders Route 36, so as to prevent it from polluting Highlands and the Sandy Hook Bay, and (iii) install and repair the various required guardrails in Water Witch.

94.    Upon information and belief, this cooperation with the roads was relatively short lived. In 1995, William C. Iler, who is a gay Jewish man who had an African American partner, moved into Water Witch. A master at renovating homes that most would simply knock down, Mr. Iler began to restore his home.

95.    Upon information and belief, and just as is the case when Giraldo-James and her family walked around Water Witch, Mr. Iler and his partner too were constantly subjected to offensive remarks by jeering neighbors yelling "Homo, Homo!" Plaintiffs understand that some of these same neighbors are still residents of Water Witch and participate in the campaign against Plaintiffs and their families.

96.    Upon information and belief, once Mr. Iler obtained a set of variances from the Zoning Board of Middletown and began construction, MHI pounced. MHI claimed that Mr. Iler and his partner were not living "as a family" and as a result were in violation of Middletown zoning ordinances. MHI also claimed that the garage he was renovating, which was built in 1923, was suddenly encroaching MHI's roads. ***This marked the first time in MHI's history that it affirmatively took the position that the roads belonged to MHI and it did so in order to harass a gay Jewish man and his African American partner.*** Whatever financial catastrophe that position would cause for MHI, was outweighed by the desire to remove a Jewish and black same-sex couple.

97.    Upon information and belief, Middletown initially stringently disagreed with MHI's characterization of what entails a family for purposes of zoning. However, once the matter reached the Court and MHI was arguing that the roads were, in fact, owned by MHI, Middletown aligned with MHI and intervened in the action between Iler and MHI in order to relieve itself of the financial and legal burden of the Dirt Roads of Waterwitch. Middletown, in its own and its taxpayers' fiduciary interests, took full advantage of the bizarre circumstances under which MHI was taking a fatal position.

98.    Upon information and belief, and in 2000, MHI ultimately prevailed and in the most classic example of one shooting oneself in the foot, the Court declared the roads to be owned by MHI. With that, and to seal up any further attacks on that judicial finding, Middletown created Lot 1.01 in Block 758 to demonstrate that MHI owned its roads and was being charged taxes, …$15.06 per year, …for the first time in 104 years. The roads of MHI have remained assessed at the same $800, now twenty-three years later.

99.    As it no longer needed to rely on MHI's "agreement" that the Dirt Roads of Water Witch are owned by MHI; Middletown stopped providing any non-routine maintenance to MHI's roads for over twenty years. Defendant MHI has squandered hundreds of thousands of dollars in pointless litigation against residents of Water Witch, instead of maintaining the infrastructure or negotiating a sustainable settlement with Middletown as to maintenance.

100.    The result of this neglect has resulted in MHI having an infrastructure that is literally crumbling down the hill into the sea. The roads have been deemed "dangerous" as set forth in a November 2006 "Roads and Drainage Report" that MHI commissioned Najarian Associates to author. Two main retaining walls, one six feet high, failed over 20 years ago and **when** they completely collapse, they will bring down with them the roads that each support. The 127-year-old terra cotta sewer system was deemed past its useful life by what is now 30 years. By 2006,

most of the stormwater collection structures had exceeded their useful life, with about half of the gutters and storm water pipes in need of reconstruction. Water mains constantly break, further eroding the dirt roads and leaving residents without water. Dead trees are not removed but left to fall on telephone, electric and cable lines, blocking vehicular traffic and lead to regular outages.

### iv. _Water Witch's Environmental Crisis_

101.    Upon information and belief, Defendant MHI's neglect and failed infrastructure now has a substantial impact on the environment, human health, and public safety. The insurance policy that MHI provided to Plaintiff specifically excludes any claims related to erosion, environmental violations, or silica dust.

102.    Upon information and belief, because no money or effort is spent on "oiling" the roads, high levels of silica emit in the air. After only a few days without rain, normal vehicular traffic will kick up enough dust to coat all homes, cars, and driveways with a thin layer of red dust. The dust is constantly in the air for all residents to breathe.

103.    The Nelsons have attempted to address the Board on several occasions around the health risk of fugitive crystalline silica emissions, but Defendant Don Claussen has always shut down that discussion. Defendant Marisha Sirois has never included such dialog in any minutes she has the responsibility of drafting as secretary of MHI, and the Board of Directors refuses to place it on the agenda.

104.    A 1996 report drafted by the United States Environmental Protection Agency (the "EPA") entitled: "Ambient Levels and Noncancer Health Effects of Inhaled Crystalline Amorphous Silica" found that "The surfaces of unpaved roads are the major contributor to particulate emissions (unlike paved roadways in which silt loading is the major contributor)." It also found that "Control measures such as application of oil, …greatly influence emissions rates."

105.    Upon information and belief, and because of the indifference of the Current Officer Defendants and Former Director Defendants to the health risk of soil particles containing crystalline silica entrained to the atmosphere by vehicles from unpaved roads, the Plaintiffs feel that they must now file complaints with the relevant government agencies.

106.    Equally as troubling to Plaintiffs are the violations of law around discharging pollutants into the waters of the United States. Defendants Don Claussen and Derek DeBree have been effective in concealing these violations from the shareholders of MHI for years, notwithstanding the gravity of the impact on public safety. In emails shared with Plaintiffs, the NJDEP recapped an extremely dangerous event caused by MHI during the Independence Day weekend in 2019 in which a mother and young daughter had to be recused from the vehicle due to flash flooding.

107.    Shortly after moving to Water Witch, Giraldo received what she found to be a bizarre letter from Defendant Don Claussen that had been sent to all shareholders of MHI that mention the NJDEP without any context. However, in the letter he states that "All the obvious arguments have been made."

108.    In hearing Defendant Don Claussen discuss the situation around the NJDEP on various occasions, it became obvious to Plaintiffs that his message was that all homeowners should align with his strategy of keeping the NJDEP in the dark.

109.    Despite promising to provide documentation around the NJDEP to Plaintiffs, Defendants Don Claussen and Derek DeBree failed to produce a single page of documentation to shareholders of MHI. However, so confident was Defendant Derek DeBree, that he provided Plaintiff Mitchell Nelson with the name of the NJDEP Investigator, Terry Rutkowski.

110.    After speaking with Ms. Rutkowski, Plaintiff Mitchell Nelson realized that the representations that the Current Officer Defendants and Former Director Defendants had made over the previous three-four years were not accurate. As he was speaking to a state official around an investigation, he felt it was his duty to provide what he knew about the situation, including the fact that MHI had not been transparent with its shareholders.

111.    A few days after speaking to the investigator, Plaintiff Mitchell Nelson received an unsigned letter purported from the Board of MHI, but not on its letterhead. In that letter, Plaintiff Mitchell Nelson was warned that he was not entitled to have discussions with the NJDEP and that MHI would sue him if he continued. He felt this was a clear case of witness tampering by the Current Officer Defendants and their lawyers Cutolo Barros LLC. As such, Plaintiff Mitchell Nelson formally engaged Counsel for Plaintiffs, who responded to Defendants MHI as well as Cutolo Barros LLC that his client would, of course, cooperate with a NJDEP investigation.

112.    Plaintiffs and their Counsel agreed to cooperate with Ms. Rutkowski as it was clear that the Current Officer Defendants had no intention of making any progress around MHI's violations, which meant a public safety issue remained and MHI's liability would only increase. The NJDEP, and Plaintiffs were able to exchange information that help put pressure on MHI into addressing the intentional harm it was causing.

113.    There was a major breaking point on May 20, 2022, when a rainstorm once again caused a closure of Route 36 with devastating consequences, including vehicular accidents. Plaintiffs immediately reported it to the NJDEP.

114.    Three years after the closure of Route 36 caused by Defendant MHI left a mother and child stranded, an identical event happened once more. Incredibly, two days later, MHI brought tons of dirt up the hill to replace what had just washed down. After three years of Defendant Don

Claussen dragging his feet, the NJDEP had had enough. Two days after the event, it issued a Notice of Violation, and almost a year later, there has been no change.

115.    Defendants Don Claussen, Derek DeBree, and Matt Maccia have openly blamed Plaintiffs for the issuance of the Notice of Violation. The three have rallied many in the neighborhood against them by portraying them as traitors because they chose to cooperate with an investigation by an agency of the State of New Jersey. As such, it is no surprise that the Current Officer Defendants have orchestrated a "remediation plan" that would result in creating a major flooding risk to both of Plaintiffs' homes.

_v._    _Events since Plaintiffs' Arrival_

116.    All of the Current Officer Defendants recently become shareholders of MHI, with the longest holding of shares being since only 2017, which is the same year the Nelsons purchased their home in Water Witch.

117.    While there was no documented election whatsoever, soon after his arrival in 2018, Defendant Don Claussen declared himself to be the "president" of MHI. Later, he claimed to be both the president and the treasurer. Since this time, Defendant Don Claussen has used misrepresentation to (i) increase "fees" to pay for maintenance and repair of the clubhouse due to its inability to operate during the COVID-19 pandemic, (ii) seek amendments to the by-laws to effectively create a set of CC&Rs, and (iii) claim the homeowners of MHI .

118.    The Current Officer Defendants and Former Director Defendants have acted in bad faith and without any authority under the bylaws of MHI, or the New Jersey Business Corporation Act. These Defendants secretly assist each other, directly and through their representatives (including legal representatives), in (a) setting up shell companies for personal profit, (b) concealing information from shareholders, (c) recording and submitted to government officials

forged documents, (d) capriciously and arbitrarily applying their limited authority, (e) purposely attacking and retaliating against shareholders that object to the demand for fees to which MHI is not entitled, and (f) coordinating campaigns to harass those in protected classes.

119.    These acts are done for the purpose of misappropriating corporate opportunities and assets in order to (a) realize hundreds of thousands of dollars of profit belonging to MHI shareholders, (b) maximize the value of their own and certain other homes/shares while encumbering the assets of fellow neighbors/shareholders, and (c) promote, sanction, and condone a culture of harassment, antisemitism, and racism that has plagued Water Witch during its 127-year history.

120.    The nature, purpose, and willfulness of the acts of the Current Officer Defendants and Former Director Defendants precludes each of these individuals from any notion of exculpation. They do not act with negligence.

121.    In addition to the claims against the Current Officer Defendants and Former Director Defendants and other representatives of MHI, Plaintiffs also asserts claims of fraudulent inducement, detrimental reliance, and negligence as to MHI, the corporate entity, as well as Access Property Management, Inc. and one of its officers, Defendant Louise Krinsky, who are both agents of MHI.

122.    With respect to the Goerke Defendants, two generations of their ancestors and at least two of these six people enjoyed the Goerke Estate over the course of 34 years, in which they swam in the pool that their family built on the property and played on the tennis court that was also built by their family. The same quite enjoyment was had by the two white families that subsequently owned the Goerke Estate before Giraldo-James.

123.    When the Current Officer Defendants informed the Goerke Defendants, two of whom had met Plaintiffs while trespassing on the property, the Goerke Defendants did not hesitate to execute deeds and agreements that would allow Defendant MHI to (i) prevent Giraldo-James from using the pool or tennis court and (ii) redirect the pollutants from the Sandy Hook Bay onto the property of the Nelsons.

124.    Despite efforts to reach out to the Goerke Defendants, they now all claim to be represented by Cutolo Barros LLC in order to use a purported attorney-client relationship to conceal the accord reached, which Plaintiffs believe is motivated by their desire to perpetuate the legacy of their family in keeping Water Witch white.

125.    Finally, both Defendants Trident Title Agency and Morgan Engineering LLC assist the Current Officer Defendants in conducted the fraudulent scheme.

126.    Plaintiff Giraldo-James hired Trident and Morgan to help with (i) the acquisition of the property, with specific interest in two strips of land that Defendant MHI had sold to Giraldo-James predecessor-in-interest in 1902, and (ii) the legal process by which Middletown would correct the Tax Map that did not reflect that 1902 transaction. She was unaware of the relationship between these two and the Current Officer Defendants.

127.    During the acquisition phase, Trident failed to identify no less than seven deeds in the chain of title, including the 1902 deeds. Ultimately, Giraldo-James could not wait for perfection, so she closed as is. After the closing, she began working with Morgan on creating an accurate survey. Once that survey was complete, Giraldo-James submitted it to Middletown and Middletown's tax assessor confirmed that the corrections would be (and have been) made.

128.    Once that process was complete, Morgan set down corner markers. The same day, Cutolo Barros contacted both Trident and Morgan, who initially worked together to provide a draft

survey to suggest a change to the submitted survey. The notes are none sensical, and ultimately, Giraldo-James fired both and had another surveyor produce a new and accurate survey.

129.    Defendant MHI, the Current Officer Defendants, the Former Director Defendants, the Shareholder Defendants, the Vendor Defendants, and Defendant Kristine Claussen are hereinafter referred to as the "***MHI RICO Enterprise***."

130.    Plaintiffs purchased their homes in reliance upon: (a) the annual fee would provide services and other benefits not found in other neighborhoods, (b) the fact that the by-laws of MHI defined its authority, which is nonexistence with respect to each homeowner's existing residences, (c) the fact that MHI's is prohibited from amending the By-laws, which can only by modified by a super majority of all homeowners in a process pursuant to law of this State, (d) a 1989 agreement made by ordinance in which Middletown is responsible for any non-routine repairs MHI's roadway infrastructure, and (e) the Board complying with not only MHI's by-laws and but also state law, including, but not limited to, statutes under both the New Jersey Business Corporation Act (*N.J.S.A.* 14A:1-1, et seq.) and New Jersey Planned Real Estate Development Full Disclosure Act (*N.J.S.* § 45:22A-21. , et seq.).

131.    Unfortunately, what the Plaintiffs discovered after purchasing their homes was that MHI is not at all what it represented itself to be but instead something that behaves like cult designed to encourage new homeowners, who can afford to pay millions for properties that were readily available for a fraction of the cost only years before, to foot the bill for the self-dealing in which a dozen or so homeowners have engaged in over the past 20 years, unbeknownst to and to the extreme and actual detriment of most other shareholders.

132.    The purpose of the reformulation of MHI in 1972 with equal shareholders was to maintain a democratic process of one vote for each home in all matters effecting the community. This has been permanent destroyed by various individuals serving as officers over the last twenty

years, and in particular by the Current Officer Defendants. As such, MHI serves no useful function except to allow certain homeowners to manipulate and dictate terms upon other homeowners/shareholders.

133.    In addition to damages, disgorgement of profits, and other restitution from the Defendants and their representatives, Plaintiffs seek the specific performance of (i) transfer of ownership of the roadway system of Water Witch to a non-profit entity that will be responsible, in coordination with Middletown, for restoring and maintaining the same ("Water Witch Roadway Foundation"), (ii) public auction of all the remaining assets of MHI with the proceeds used to fund the Water Witch Roadway Foundation. Plaintiffs do not oppose a circumstance in which any group of shareholders that is successful in purchasing MHI assets at said auction, to take such assets by way of a "spinoff/spinout" into a new and separate non-profit entity so that the 1895 date of incorporation is maintained along with the name "Monmouth Hills."

134.    The Defendants has caused Plaintiffs to suffer losses and harm in an amount at least $4,000,000.00 plus interest and for exact amount to be determined at trial, and Plaintiffs seek to recover their monies under, among other legal bases, violations of the Federal RICO Act, 18 U.S.C. § 1961, *et seq.*; New Jersey Civil RICO Act, N.J.S.A. § 2C:41-1, *et seq.*; the Fair Housing Act of 196, 42 U.S.C. § 3601, *et seq.* ("Fair Housing Act"); together with state causes of action for common law fraud; fraud in the inducement; equitable fraud; breach of fiduciary duties; professional negligence; breach of contract; and conversion.

## COUNT I

### (VIOLATION OF THE RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c), ALL DEFENDANTS)

135.    Plaintiffs reallege and incorporate by reference the allegations set forth in Paragraphs 1 through 134.

136.    The Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68, provides a private civil actions to recover treble damages for "any person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c).

137.    18 U.S.C. § 1962(c) makes it unlawful "for any person employed by or associated with any enterprise . . .  to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."

138.    The definitional section of RICO defines a "pattern of racketeering activity" as requiring "at least two acts of racketeering activity" within ten years. 18 U.S.C. § 1961(5).

139.    Racketeering activity is defined in 18 U.S.C. § 1961(A)-(B) to include wire fraud in violation of 18 U.S.C. § 1343.

## THE RACKETEERING DEFENDANTS

140.    18 U.S.C. § 1962(c) makes it unlawful for "any person" to conduct or participate, directly or indirectly, in the conduct of an enterprise through a pattern of racketeering activity.  The definitional section of RICO defines a "person" as "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

141.    The Current Officer Defendants and the Former Director Defendants, for years, with the aid and assistance of the other Defendants, have organized and operated a fraudulent real estate scheme that seeks to (i) extract from homeowners in Water Witch hundreds of thousands of dollars each year for "services" that such homeowners are already entitled as full-rate taxpayers of Middletown, and (ii) control and convert real property owned in fee simple by homeowners and not Defendant MHI.

142.    Defendants had specific roles in the MHI RICO Enterprise.  For example, Defendant Don Claussen operates autocratically and is effectively an intolerant cult leader. Discourse is not allowed during Board meetings. There has never been anything but unanimous vote at all meetings. Most decisions are made by him alone and he misrepresents that he had Board consent or approval, when in fact, no meeting has even occurred.

143.    Defendant Derek DeBree is local to the area and uses his personal relationships and status as an agent of Defendant Fox & Roach LP d/b/a Berkshire Hathaway HomeServices Fox & Roach, REALTORS® to influence and convince homeowners and others as to his authority.

144.    Defendant Marisha Sirois as secretary of MHI controls the corporate records, which previously were centralized and in hard copy form at the clubhouse, but along with Defendant Kristine L. Claussen, limits shareholder access to the clubhouse. In exchange for her unwavering support of the actions taken by the other Current Officer Defendants, she has been granted "approval" for a massive ultra-modern structure that is completely incongruent with the historical aesthetic of Water Witch.

145.    Like Defendant Marisha Sirois, in exchange for her unwavering support of the actions taken by the other Current Officer Defendants, Defendant Julie Swartwood has been granted "approval" for her renovations to her home.

146.    The Current Officer Defendants simply continue the actions of the Former Director Defendants. For example, Defendant Leslie Krause profited hundreds of thousands of dollars by diverting a corporate opportunity to himself and used Cutolo Barros LLC to represent him personally in that transaction.

147.    The Defendants are separate, culpable parties who benefitted individually and collectively, either directly or indirectly, from the pattern of racketeering activity over a period of more than seven years.

148.    Defendants conducted and participated, directly and indirectly, in the affairs of the MHI RICO Enterprise through a pattern of racketeering activity, over a period of more than seven years and are thereby considered persons within the meaning of RICO.

## THE MHI RICO ENTERPRISE

149.    18 U.S.C. § 1962(c) prohibits conducting the affairs of an enterprise through a pattern of racketeering activity.   The definitional section of RICO defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 USC § 1961(4).

150.    Defendants, together with other Related Parties, constitute an association-in-fact criminal enterprise, within the meaning of 18 U.S.C. § 1961(4), which has engaged in activities that affect interstate commerce.  The MHI RICO Enterprise engaged in racketeering activities over the course of at least five years as a regular way of doing business and still exists and poses a substantial ongoing threat of continuing its pattern of racketeering activities into the future.

## DEFENDANTS COMMITTED MULTIPLE RACKETEERING ACTS

151.    18 U.S.C. § 1962(c) prohibits conducting the affairs of an enterprise through a pattern of racketeering activity.   The definitional section of RICO provides that wire fraud in violation of 18 U.S.C. § 1343 are "racketeering activity."

152.    The wire fraud statute, 18 U.S.C. § 1343, prohibits a broad range of activity by anyone "having devised or intending to devise any scheme or artifice to defraud, or for obtaining

money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire" in interstate commerce "any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme."

153.    Defendants, in coordination with and/or on behalf of each other, sent numerous interstate text messages, sent numerous emails to Plaintiffs over the course of five years, in furtherance of the Defendants' scheme to defraud the Plaintiffs in violation of 18 U.S.C. § 1343, including, but not limited to:

> •    An email sent from New Jersey by Defendant MHI and Louise Krinsky to Plaintiff Giraldo-James in New York on February 25, 2021 regarding a MHI Board meeting that included a letter dated January 20, 2021 from Defendant Don Claussen;

> •    An email sent from New Jersey by Defendant MHI and Louise Krinsky to Plaintiff Giraldo-James in New York on February 26, 2021 regarding a MHI financials;

> •    An email sent from New Jersey by Defendant MHI and Louise Krinsky to Plaintiff Giraldo-James in New York on March 3, 2021 regarding MHI financials and fee increases;

> •    An email sent from New Jersey by Defendant MHI and Louise Krinsky to Plaintiff Giraldo-James in New York on April 16, 2021 regarding MHI financials and fee increases;

> •    An email sent from New Jersey by Defendant MHI and Louise Krinsky to Plaintiff Giraldo-James in New York on May 17, 2021 regarding "regular meetings;"

> •    An email sent from New Jersey by Defendant MHI and Louise Krinsky to Plaintiff Giraldo-James in New York on May 21, 2021 regarding response to document requests;

> •    An email sent from New Jersey by Defendant MHI and Louise Krinsky to Plaintiff Giraldo-James in New York on June 4, 2021 regarding MHI financials; and

> •    An email sent from New Jersey by Defendant MHI and Louise Krinsky to Plaintiffs in Florida on March 23, 2023 regarding minutes of February 18, 2023 Board meeting.

154.    Defendants MHI received three interstate wire transfers of funds in New Jersey from Plaintiff Giraldo located in New York over the course of two years, in furtherance of the Defendants' scheme to defraud the Plaintiffs in violation of 18 U.S.C. § 1343.

155.    Thus, Defendants, through the MHI RICO Enterprise, committed dozens of separate acts of wire fraud in furtherance of their fraudulent scheme in violation of 18 U.S.C. §§ 1341, 1343.

## DEFENDANTS' PATTERN OF RACKETEERING ACTIVITY

156.    18 U.S.C. § 1962(c) prohibits conducting the affairs of an enterprise through a "pattern of racketeering activity," which is defined as "at least two acts of racketeering activity." 18 U.S.C. § 1961(5).  As discussed above, wire fraud, together with extorsion, are considered "racketeering activity."

157.    Over the course of at least five years, the Defendants conducted the affairs of the MHI RICO Enterprise by committing multiple acts of wire fraud in furtherance of their schemes to defraud the Plaintiffs.  Each act constitutes a separate instance of interrelated racketeering activity.

158.    The Defendants' racketeering activity threatens to continue unabated, driven by the possibility of repeated economic gain, and the ability to invest the racketeering income back into the MHI RICO EnterpriseThe injury to the Plaintiffs' property was proximately caused by the Defendants' pattern of racketeering.

159.    As a direct and proximate cause of the Defendants' actions in violation of 18 U.S.C. § 1962(c), the Plaintiffs have been and continue to be injured in their property within the meaning of 18 U.S.C. § 1964(c) in an amount to be determined upon trial of this action, which amount

exceeds Two Million Dollars ($2,000,000.00) and the sum duly trebled in accordance with 18 U.S.C. § 1964(c).

**WHEREFORE**, Plaintiffs hereby demand judgment be entered in their favor and against Defendants, as well as against John/Jane Does 1-15 and ABC Corporations 1-5, each of them individually, jointly and severally as follows:

(A)     For damages against the Defendants, each of them individually, jointly and severally, in an amount to be determined upon trial of this action, which amount exceeds Two Million Dollars ($2,000,000.00) and the sum duly trebled in accordance with 18 U.S.C. § 1964(c);

(B)     For costs of this suit including reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c); and

(C)     For such other and further relief this Court finds just and equitable.

## COUNT II

## (CONSPIRACY TO VIOLATE THE RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d), ALL DEFENDANTS)

160.     Plaintiffs reallege and incorporate by reference the allegations set forth in Paragraphs 1 through 159.

161.     18 U.S.C. § 1962(c) prohibits conducting the affairs of an enterprise through a pattern of racketeering.  18 U.S.C. § 1962(d) makes it "unlawful to conspire to violate [18 U.S.C. § 1962(c)]."  Hence, 18 U.S.C. § 1962(d) makes it unlawful to conspire to conduct the affairs of an enterprise through a pattern of racketeering activity.

162.     The Defendants conspired and agreed with each other to engage in the conduct, or attempted conduct stated above, and also conspired and agreed to aid each other in the racketeering acts, as stated above.

163.    The Defendants conspired, planned and schemed to use the MHI RICO Enterprise as a racketeering enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

164.    The Defendants conspired to violate 18 U.S.C. § 1962(c) by conducting the affairs of the MHI RICO Enterprise through a pattern of racketeering activity by committing multiple acts of mail and wire fraud.

165.    Each of the Defendants combined, conspired and confederated with each other to commit a pattern of racketeering activity, and thereby violated 18 U.S.C. § 1962(d) by conspiracy to violate 18 U.S.C. § 1962(c).

166.    As a direct and proximate cause of the Defendants' actions in violation of 18 U.S.C. § 1962(d), the Plaintiffs have been and continue to be injured in their business or property within the meaning of 18 U.S.C. § 1962(d) in an amount to be determined upon trial of this action, which amount exceeds Two Million Dollars ($2,000,000.00) and the sum duly trebled in accordance with 18 U.S.C. § 1964(c).

**WHEREFORE**, Plaintiffs hereby demand judgment be entered in their favor and against Defendants and John/Jane Does 1-15 and ABC Corporations 1-5, each of them individually, jointly and severally as follows:

(A)    For damages against the Defendants, each of them individually, jointly and severally, in an amount to be determined upon trial of this action, which amount exceeds Two Million Dollars ($2,000,000.00) and the sum duly trebled in accordance with 18 U.S.C. § 1964(c); and

(B)    For costs of this suit including reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c); and

(C)    For such other and further relief this Court finds just and equitable.

## COUNT III

### (VIOLATION OF NEW JERSEY CIVIL RICO STATUTE,
### N.J.S.A. 2C:41-1 *et seq.*, ALL DEFENDANTS)

167.    Plaintiffs reallege and incorporate by reference the allegations set forth in Paragraphs 1 through 166.

168.    For the purposes of Count III, Plaintiffs allege that Defendants acted with the knowledge and intent required to violate the statutes identified as racketeering activity below and/or were willfully blind to or deliberately ignorant of the falsity of the information they conveyed to Plaintiffs.

169.    Defendants violated the New Jersey Civil RICO statute by committing or conspiring amongst themselves and others to commit a pattern of racketeering activity in violation of N.J.S.A. §§ 2C:41-2(c) and -2(d).

170.    Defendants constitute a criminal enterprise, within the meaning of N.J.S.A. § 2C:41-1(c), which has engaged in racketeering activities over a length of time as a regular way of doing business.  That enterprise, the MHI RICO Enterprise, is described in detail above.

171.    The members of the MHI RICO Enterprise play specific and well-defined roles and share a common purpose of obtaining pecuniary gain, including money, in connection with their fraudulent "homeowners' association scheme."

172.    At all relevant times, the MHI RICO Enterprise was and remains engaged in activities affecting trade or commerce, including, but not limited to, activities in connection with the sale, purchase, and use of real property in the State of New Jersey.

173.    Defendants have violated and continue to violate N.J.S.A. § 2C:41-2(c) by managing a racketeering enterprise, the MHI RICO Enterprise, which implemented and continues to implement a plan and pattern of racketeering activities.

174.    Defendants have committed a pattern of racketeering activity through their agreement to participate in and actual participation in the MHI RICO Enterprise, which is an association-in-fact enterprise within the meaning of N.J.S.A. § 2C:41-1(c).

175.    Defendants have conspired, among themselves and with the knowing or unknowing cooperation of others, to violate and continue to violate N.J.S.A. § 2C:41-2(d) by managing a racketeering enterprise, the MHI RICO Enterprise, which implemented and continues to implement a plan and pattern of racketeering activities.  In furtherance of that conspiracy, Defendants committed overt acts that include, but are not limited to, the racketeering activity under N.J.S.A. § 2C:41-1(a)(2) as alleged in *supra* paragraphs.

176.    Additionally, Defendants, through the MHI RICO Enterprise, violated several sections of the New Jersey Uniform Securities Act, N.J.S.A. § 49:3-47 *et seq.*, *see infra* paragraphs193-203, and each violation on its own constitutes racketeering activity pursuant to N.J.S.A. § 2C:41-1(a)(p).

177.    Defendants, through the MHI RICO Enterprise, on two or more occasions, also purposefully committed, attempted to commit, solicited another to commit, conspired to commit, or engaged in acts involving theft by deception in violation of N.J.S.A. § 2C:20-4 by obtaining the property of another by deceitful means and artful practices with the intention of depriving Plaintiffs of their property.

178.    As elaborated upon above, Defendants repeatedly used false and misleading statements to induce Plaintiffs to pay association fees.  Through this conduct, Defendants created

or reinforced Plaintiffs' false impression of existing facts, including facts relating to the value of their investments in Defendant MHI, which Defendants knew or believed to be false, in violation of N.J.S.A. § 2C:20-4(a).

179.    The Current Officer Defendants also prevented Plaintiffs from obtaining information pertinent to their investments in Defendant MHI, including information that would have contradicted the false representations of fact provided by Defendants in furtherance of their homeowners' association scheme and in violation of N.J.S.A. § 2C:20-4(b).  Defendants failed to correct a false impression they created or reinforced by their purposeful delay and unscrupulous tactics in not providing information in further violation of N.J.S.A. § 2C:20-4(c).

180.    Defendants' repeated and related violations of N.J.S.A. § 2C:20-4(a), (b), and (c) constitute racketeering activity pursuant to N.J.S.A. § 2C:41-1(a)(n).

181.    Defendants, therefore, have committed many criminal acts in furtherance of their homeowners' association scheme which qualify as racketeering activity under N.J.S.A. § 2C:41-1.

182.    Defendants violated N.J.S.A. § 2C:41-2(c) by associating with an enterprise and conducting or participating, indirectly or indirectly, in that enterprise through a pattern of racketeering activity.

183.    Defendants also violated N.J.S.A. § 2C:41-2(d) by conspiring with others, including, but not limited to, other members of the MHI RICO Enterprise, to violate N.J.S.A. § 2C:41-2(c).  In furtherance of that conspiracy, Defendants committed overt acts that include but are not limited to the racketeering activity alleged above.

184.    As a direct and proximate result of these racketeering activities by Defendants, Plaintiffs have suffered injury to their business and property, as well as costs and attorneys' fees

relating to this action.  Plaintiffs are entitled to an award of treble damages and reasonable attorneys' fees incurred in pursuing this action pursuant to N.J.S.A. § 2C:41-4(c).

**WHEREFORE**, Plaintiffs hereby demand judgment be entered in their favor and against Defendants and John/Jane Does 1-15 and ABC Corporations 1-5, each of them individually, jointly and severally as follows:

(A)  For damages against the Defendants, each of them individually, jointly and severally, in an amount to be determined upon trial of this action, which amount exceeds Two Million Dollars ($2,000,000) and the sum duly trebled in accordance with N.J.S.A. § 2C:41-4(c); and

(B)  For costs of this suit including reasonable attorneys' fees in accordance with N.J.S.A. § 2C:41-4(c); and

(C)  For such other further relief that this Court deems just and proper pursuant to N.J.S.A. § 2C:41-4(a).

## COUNT VII

### (COMMON LAW FRAUD/FRAUD IN THE INDUCEMENT, ALL DEFENDANTS)

185.  Plaintiffs reallege and incorporate by reference the allegations set forth in Paragraphs 1 through 184.

186.  Defendants made, authorized, or caused the representations discussed above, including, but not limited to, the representations in *supra* paragraphs.

187.  The material representations set forth above were fraudulent, and Defendants' representations fraudulently omitted material statements of fact.

188.    Defendants knew their representations and omissions were false and/or misleading at the time they were made.

189.    Defendants made the misleading statements with intent to defraud Plaintiffs.

190.    Defendants had reason to expect that Plaintiff would receive and rely upon such representations, and intended that their misleading statements would induce Plaintiffs to purchase property in Water Witch and pay homeowners' association fees.

191.    Plaintiffs justifiably relied upon Defendants' false representations and misleading omissions.

192.    Had Plaintiff known the true facts regarding the Defendants' fraudulent practices, they would have neither made the equity investment in Defendant MHI.

193.    As a result of the foregoing, Plaintiffs have suffered damages.

194.    Defendants rendered intentional and substantial assistance to each other in order to advance the fraud on Plaintiffs.

195.    Each of the Defendants knew of the fraud perpetrated by the other Defendants. Each knew of the representations and omissions made by the others. Each also knew that the representations and omissions made by each of the other Defendants were false and/or misleading at the time they were made.

196.    Defendants had actual knowledge of, and substantially assisted in, the fraudulent scheme to obtain funds from the Plaintiffs through the fraudulent real estate investment scheme and fraudulent loan programs. Because of intertwined business operations and the fluid transfer of information among the Defendants, each knew of the fraud perpetrated on Plaintiffs.

197.    Each Defendant acted in concert to defraud Plaintiffs.

198.    Defendants provided each of the others with substantial assistance in making the fraudulent representations and omissions.

199.    Defendants could not have perpetrated their fraud without the substantial assistance of each other and they all provided financial, strategic, and marketing assistance for their related investment schemes.  Defendants are intertwined and interdependent and each benefited from the success of their related investment schemes.

200.    As a direct, proximate, and foreseeable result of the Defendants' actions, Plaintiffs have suffered damages.

**WHEREFORE**, Plaintiffs hereby demand judgment be entered in their favor and against Defendants, together with John/Jane Does 1-15 and ABC Corporations 1-5, each of them individually, jointly and severally, awarding damages for an exact amount to be determined at trial, but, in any event, to be at least $2,000,000.00, together with prejudgment interest, reasonable attorneys' fees and costs, punitive damages, and for all other relief this Court finds just and equitable.

## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demand a trial by jury of any issue triable of right by a jury.

Dated: Rumson, New Jersey

April 4, 2023

**LAW OFFICES OF G. AARON JAMES**

By:   /s/ G. Aaron James
    G. Aaron James
    6 Hunt Street, #336
    Rumson, New Jersey 07102
    Telephone:  (973) 200-4066

*Attorneys for Plaintiffs*
*Mitchell Nelson, Sarah E. Hearn-Nelson,*
*and Paulina Giraldo-James*